## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

|  |  |  |
|---|---|---|
| **CHERYL KRUTSINGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Case No.  05-2019** |
| **JO ANNE B. BARNHART, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

In July 2004, Barbara Welsch, an administrative law judge (hereinafter "ALJ"), denied social security benefits to Plaintiff Cheryl Krutsinger.  The ALJ based her decision on findings that Plaintiff was not disabled within the meaning of the Social Security Act and she was capable of performing a significant number of jobs available in the national economy.

In January 2005, Plaintiff filed a Complaint (#1) against Defendant Jo Anne Barnhart, the Commissioner of Social Security, seeking judicial review of the final decision by the Regional Commissioner of the Social Security Administration denying social security benefits.  In July 2005, Plaintiff filed a Motion for Summary Judgment (#10) and in October 2005, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#14).  After reviewing the administrative record and the parties' memoranda, this Court recommends **GRANTING** Plaintiff's Motion for Summary Judgment **(#10)** and **DENYING** Defendant's Motion for an Order Which Affirms the Secretary's Decision **(#14)**.

### I.  Background

### A.  Procedural Background

Plaintiff applied for social security benefits in September 2001, alleging disability beginning March 19, 2001.  The Social Security Administration denied her application initially and upon reconsideration.  She appealed and ALJ Welsch held a hearing in October 2003.  In July 2004, the ALJ denied Plaintiff's application for social security benefits based on findings

that Plaintiff was not disabled within the meaning of the Social Security Act and she was capable of performing a significant number of jobs that exist in the national economy.  In December 2004, the Appeals Council denied Plaintiff's request for review and Plaintiff subsequently appealed the decision to this Court.

### B.  Plaintiff's Medical Background

The following background is taken from the record.  Plaintiff was forty-one years old at the time of the hearing.  She had completed three years of college and an apprenticeship as a substation electrician.  She began working for Illinois Power in 1986 as a meter reader.  In 1992, she was promoted to the position of meter changer.  She eventually attained the position of substation electrician, a position she held until 2001.

In March 2001, Plaintiff was exposed to polychlorinated biphenyls (hereinafter "PCBs") on three consecutive days while working for Illinois Power.  A fat biopsy based on a sample taken in July 2001 showed that her tissue contained PCBs in an amount of 87.7 parts per billion. (R. 148, 150.)  Following the exposure, she was hospitalized for six days and treated for widespread urticarial eruptions (hives) and pulmonary problems (asthma).  She returned to work part time in April 2001 and then worked full time for a short period.  She was exposed to PCBs again and experienced a recurrence of severe symptoms.  She last worked at Illinois Power in July 2001.  (R. 181.)

X-rays taken March 22, 2001, showed that Plaintiff's heart was normal in size and her lungs were free of any active pulmonary process.  (R. 138.)  On March 29, 2001, Dr. Kaushik Patel performed a pulmonary function test that showed "normal spirometry except for borderline low FEV1/FVC ratio suggestive of early airway obstruction with normal lung volumes, diffusion capacity and marked increase of resistance."  (R. 133.)

In April 2001, Dr. George Savvas, her treating physician, released her to return to work part time beginning April 23, 2001, with some restrictions as to prolonged walking, standing,

lifting, or sitting, and no exposure to PCBs.  (R. 241-42.)  In May 2001, Dr. Savvas released
Plaintiff to return to work full time.  (R. 239-40.)  At work, she was again exposed to PCBs.

In May 2001, Plaintiff consulted Dr. Thomas Sutter, a specialist in occupational
medicine.  Dr. Sutter observed that her skin showed a light rash, her chest was clear, and her
heart rate and rhythm were regular.  He referred her to the allergy department.

In June 2001, Dr. Terrence Moisan evaluated Plaintiff and stated as follows:

> She still has some breakthrough urticaria and itching when she mows the
> lawn, perhaps when in a hot shower, and has had dermagraphism, which she may
> have had even prior to the exposure.  She has had a number of medications before
> and after this episode . . . .
>
> [She also has] some audible wheezing.  She has been on an occasional
> inhaler, . . . but is using it infrequently, and she believes that the respiratory
> symptoms have been waning.  She has no other obvious environmental or
> occupational allergens that I can elicit.
> . . . .
> Pulmonary functions . . . on 03/27/01 revealed a normal total lung capacity
> and residual volume, a normal diffusion, and no significant airway obstruction.
> . . . .
> The fact that she continues to have symptoms three months afer cessation
> of exposure despite the use of Claritin also is suggestive of an ongoing antigenic
> stimulation.

(R. 143-45.)

In July 2001, Plaintiff began treatment with Dr. Jonathan Wasserberger, a medical
toxicologist[1] with an office in California.  She sees him in person about once a year and talks
with him by telephone or email several times a year.  In July 2001, he first examined Plaintiff
and opined as follows:

---

[1]A toxicologist is an expert in the study of the nature, effects, and detection of poisons
and the treatment of poisoning.  *Webster's II New Riverside University Dictionary* 1222 (1994).

**3**

[The patient] has new onset of cough, wheezing.  The patient cannot exercise due to difficulty breathing.  Second to inability to exercise, the patient has started to put on weight which is further compromising her exercise status.  She has new onset of diarrhea and loose stools that she has not had previously.  She also has new onset of headaches and has had a persistent low-grade headache ever since the exposure.  She has new onset memory deficits.

. . . .

The patient speaks slowly.  She has marked hives all over her face, arms, legs and abdomen, bright red in color, raised and blanch to touch.
Chest: Clear, no wheezing at this time.

Heart: Normal rate and rhythm.

Abdomen: Obese, soft and nontender.  She has normal gait, balance and coordination; normal Romberg; normal tandem gait.

. . . .

The patient's immune system was studied to try to account for the problems that she is presently experiencing with marked immune dysfunction problems secondary to the toxin exposure.  The patient's immune system showed mild neutropenia . . . .  The PCB exposure has caused this patient to be immunocompromised.  Pulmonary function tests were normal.  Liver function tests initially were elevated post exposure and now are normal.  MRI of the brain did not show any demyelination and PET scan of the brain showed normal metabolism of the brain . . . .

[The patient's] toxic exposure caused the patient to develop a persistent urticaria rhinitis, headaches and memory dysfunction.  The patient developed an exacerbation of underlying reactive airway dysfunction.  The patient is immunosuppressed.  The patient also has signs of decreased energy and concentration consistent with diagnosis of chronic fatigue in the indeficiency syndrome.  The patient also has developed exogenous obesity secondary to the inability to exercise following the difficulty breathing exacerbated by the polychlorinated biphenyl exposure.  The new onset of exogenous obesity is also due to PCB endocrine exposure . . . .  The patient also has problems sleeping secondary to anxiety from the situation . . . .  The patient is not able to reenter her toxic work environment . . . on a permanent basis.

. . . .

The patient should avoid any further exposure to PCBs for the rest of her life and needs to be considered permanently disabled from this type of employment.  The patient's condition is considered to be permanent and stationary.  It is 100 percent medical worker's compensation related.  It is 100 percent disability secondary to the rash and breathing problems, gastrointestinal

4

dysfunction, endocrine dysfunction, and immune dysfunction, entering the work environment.

(R. 150-52.)  Dr. Wasserberger then prescribed a number of drugs to treat Plaintiff's symptoms, including Claritin (an antihistamine), Pepcid (an antihistamine), Singulair (to control rash and help ameliorate shortness of breath), Flovent (to control reactive airway disease), and Valium (for anxiety).  In August 2001, Dr. Wasserberger completed a form that indicated Plaintiff could perform work if she was able to sit in a nontoxic environment.  (R. 188-91.)

In July 2001, Dr. Robert Danlev performed an MRI brain scan in response to Plaintiff's complaints of headache and memory loss.  The test results showed a normal MR brain scan. (R. 156.)  In September 2001, Dr. Craig Neitzel, a dermatologist, examined Plaintiff.  He observed that many of her skin lesions had resolved.  He prescribed a topical steroid treatment for the remaining lesions, in addition to continuing to take oral antihistamines.

In October 2001, Plaintiff consulted Dr. Adrian Durand, a psychologist, for a mental status evaluation pursuant to her application for social security benefits.  He observed that she exhibited average ability in attention, short-term memory, verbal concept formation, and logical thinking.  Plaintiff's scores in reading, sight word vocabulary, and decoding skills were in the low average range.  In arithmetic, she was able to do simple addition, subtraction, multiplication, division, fractions, and decimals.  Dr. Durand opined that Plaintiff suffers from severe depression.  (R. 176-80.)

In October 2001, Dr. Paul Cadwell, an agency physician, evaluated Plaintiff's mental condition based on a review of Plaintiff's file.  (R. 249-66.)  He opined that she suffered from severe depression.  (R. 252.)  Dr. Cadwell also completed a Mental Residual Functional Capacity (hereinafter "MRFC"), reporting that she was not significantly limited in her ability to remember locations and work procedures, to understand, remember, and carry out very short and simple instructions, to make simple work-related decisions, to ask simple questions or request assistance, to maintain socially appropriate behavior, to adhere to basic standards of neatness and

cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make independent plans.  However, she had moderate limitations in the ability to understand, remember, and carry out detailed instructions, to complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 263-64.)  He also reported mild limitations in maintaining social functioning and concentration, persistence, or pace.  (R. 259.)  In January 2002, Dr. Phyllis Brister reviewed this assessment and agreed with it.  (R. 249.)

In October 2001, Dr. Patel again examined Plaintiff based on her "chief complaint . . . of shortness of breath since March of 2001."  (R. 181.)  Plaintiff also complained that "she does not feel as well as she previously did and does not feel that she is able to do as much activity." (R. 181.)  She reported having a constant headache that is helped by aspirin or motrin, loose bowel movements once or twice daily, and a sore throat.  (R. 181-82.)  Dr. Patel opined that Plaintiff has polysystemic problems from the exposure to PCBs.  Her "[s]ymptoms have partially improved with removal from further exposure but persist and there has been uncertain response to the treatment initiated previously by Dr. Wasserberger."  (R. 181.)

In October 2001, Dr. James Graham, an agency physician, reviewed Plaintiff's records and then completed a Residual Functional Capacity (hereinafter "RFC") form.  He reported as follows:  Plaintiff could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand or walk for six hours a day, sit about six hours a day, and push or pull without limitation.  She had no postural, manipulative, visual, or communication limitations.  She is restricted from exposure to extreme cold, heat, humidity, fumes, gases, and dust.  (R. 270-74.) Dr. Stanley Burris reviewed this assessment in February 2002 and agreed with it.  (R. 274.)

In November 2001, Dr. Wasserberger wrote a letter responding to a letter from Dr. Moisan's dated October 17, 2001.  (Dr. Moisan's letter does not appear to be part of the file.) In the letter, Dr. Wasserberger also states that Plaintiff has chronic ongoing diarrhea that is being

**6**

treated with Lomotil, and she has chronic fatigue immuno dysfunction syndrome.  (R. 230.)  He opined that Plaintiff was permanently disabled from her current position (which involved driving a truck for Illinois Power) and her previous work environment.

The ALJ received the following information after the hearing.

In October 2002, Dr. Louis D'Elia, a doctor of neuropsychology, examined Plaintiff. (R. 279-92.)  At that time, Plaintiff reported the following physical symptoms: some itching on her arms, diarrhea, weak knees, weight gain, and high blood pressure, and she had shingles three times during the summer; she sometimes has lung congestion, sinus problems, and a rash; she has bladder problems from coughing; she has frequent headaches, multiple allergies, asthma, nausea, loss of bowel control, excessive fatigue, arthritis, and chronic pain, occasional feelings of numbness and tingling, difficulty smelling, and loss of muscle tone.  She also stated that she is forgetful and has problems with concentration, short term memory, mental processing, handwriting, word finding, spelling, math, understanding what she is reading, and decision-making.  She feels depressed, anxious, and stressed, gets easily frustrated and is more irritable, has trouble sleeping, and reports decreased libido.

Dr. D'Elia stated that Plaintiff appeared to be exerting her best effort to respond to his questions; however, he observed that she tired easily and had to take several breaks.  He noted that she became confused by multi-part questions and had difficulty maintaining the instructional set.  She showed attentional overload and was distracted by internal stimuli.  She exhibited mild word finding difficulty and paraphasic errors.  She spoke slowly and coughed frequently. Dr. D'Elia opined that Plaintiff's intellectual ability, verbal, and performance functions were average.  Assessment of her attention and concentration functions indicated variable performance generally within the borderline to low end of average range.  Her vocabulary skills were in the low average range, she pronounced words at high school level, and spelled at eighth grade level.  She performed below expectation on verbal fluency and category retrieval tests and in the impaired range on tests of confrontation naming test and gross reading speed.  The results

of her visual-perceptual, visual-organizational, and visual-construction skills tests indicate those are areas of strength.  Dr. D'Elia summarized his findings as follows:

> [Plaintiff] continues to experience lingering cognitive, emotional and physical symptoms.  She currently meets DSM-IV-TR clinical diagnostic criteria for Cognitive Disorder, NOS (moderate).  The current evaluation clearly documents significant difficulties in attention, speed of processing, language, memory (especially verbal learning and memory), and executive functions.  She also meets clinical diagnostic criteria for a moderate-severe Adjustment Disorder with Depressed and Anxious mood.

(R. 291.)

In May 2003, Dr. Wasserberger completed an RFC questionnaire.  He opined as follows: Plaintiff suffers from depression, anxiety, and cognitive disorders; during a typical work day; she experiences symptoms severe enough to interfere with attention and concentration; she is incapable of even "low stress" jobs due to her depression and cognitive and anxiety disorders; she can walk only one city block without rest; she can sit for forty-five minutes at one time before needing to get up and stand for twenty minutes at one time before needing to sit or walk around; she can sit for at least six hours and stand or walk less than two hours in an eight-hour day; and she needs a job that permits shifting positions at will from sitting, standing, or walking and will sometimes need to take unscheduled breaks during an eight-hour day due to uncontrollable diarrhea.  Plaintiff should never lift more than ten pounds but rarely may lift up to ten pounds; she can never crouch, climb ladders, or climb stairs, and can rarely twist, bend, or stoop; she has no limitations as to performing repetitive reaching or hand movements; she is likely to be absent from work more than four days per month; and she should avoid exposure to toxic gases.  (R. 275-78.)

In June 2003, Dr. Wasserberger completed some disability insurance claim forms describing Plaintiff's condition.  (R. 300-02.)  Regarding her psychological functions, he opined that she is able to engage in only limited stress situations and limited interpersonal relations. (R. 301.)  He opined that she can sit for eight hours a day and walk or stand for one hour a day; she can reach above shoulder level and operate a motor vehicle, but can not climb, twist, bend,

**8**

or stoop; and she can occasionally lift up to ten pounds.  He noted that she can only work in a clean, air-conditioned building near a bathroom.  Regarding her cardiac function, he noted that her blood pressure was 150/133 as of February 2003 and that she has a class 3 heart condition.  He also noted that he had advised Plaintiff that she could return to work full time (but not in her previous occupation) as of February 2003.  (R. 300-02.)

In February 2004, Dr. Wasserberger completed a Physical Capacities Evaluation and a Long Term Disability Claim Form.  (R. 296-98.)  Regarding Plaintiff's psychological functions, he opined that she is able to engage in only limited stress situations and limited interpersonal relations.  (R. 298.)  He opined that she could sit for eight hours a day, stand for two hours a day, and walk for one hour a day.  She could reach above shoulder level, but could not climb, twist, bend, stoop, squat, or tolerate temperature and humidity change, exposure to dust, fumes, and gases, and unprotected heights.  He stated that she experienced diarrhea on bending.  She could not lift even ten pounds.  Regarding her cardiac function, he noted her blood pressure (the numbers are illegible) as of June 2004 and that she has a class 3 heart condition.  She had no restrictions as to driving automotive equipment and only moderate restrictions related to being around moving machinery.  He noted that she can only work in a clean, air-conditioned building near a bathroom.  He also noted that he had advised Plaintiff that she could return to work part time, that is, for six hours a day, as of August 2004.  (R. 297-98.)

As of October 2003, Plaintiff's medications include Valium, Cimetidine, Triamterene, Singulair, Clarinex, Doxepin, Hydroxyzine Pamoate, Loratadine, Diphenoxylate, Captopril, and Verapamil.  Plaintiff states that she continues to experience fatigue, persistent rashes, and episodes of wheezing, in spite of taking antihistamines and using a bronchodilator.

### C.  Testimony at the Hearing

At the October 2003 hearing, Plaintiff testified that she lives by herself in a house.  Her parents live nearby and she sees them frequently.  Her mother drove Plaintiff to the hearing.  Plaintiff occasionally consumes alcohol and smokes one or two cigarettes a day.

Plaintiff has difficulty sleeping.  On a typical day, she will get up at 10:00 or 11:00 a.m. after falling asleep around 2:00 a.m.  She often feels groggy and it takes her a couple of hours to feel alert.  Then she will get her mail, get on the computer, water the plants, make her meals, read the newspaper, get on the Internet, watch TV, and read.  She reads things such as a 1,000-page article on PCBs, US magazine, the Inquirer, and electrical magazines.  She also reads articles on the computer.  She may spend from two to four hours on the computer surfing, using email, or trying to restore functions to her computer.  She has a camcorder that she uses.

Plaintiff tries to do her own housework.  She vacuums and tries to clean the house.  She does her own laundry, loads the dishwasher, makes her bed, and shops for groceries.  Her mother sometimes helps with cooking and housework.  Plaintiff does not belong to any groups or clubs. She tries to go to the monthly union meeting.  She visits with her family a lot, but does not date or socialize with others.  The last time she traveled out of state was in September 2002 to see Dr. Wasserberger.  On that trip, she rented a car and stayed at a hotel.  She does not travel out of town much; the last time she remembered being out of town was a year before the hearing when she and a friend went to Chicago.  They shared the driving.

Plaintiff has two vehicles and uses them once or twice a week.  She may go to the grocery store, to pick up her prescriptions, or to visit family.  She does some gardening, but she hires someone to mow the yard.  She used to be very active, for example, camping, fishing, or water skiing, but does not do those activities anymore.  Plaintiff has two dogs and occasionally takes them for walks.

Plaintiff testified that she has low energy, impaired cognitive and motor skills, and feels sick all the time.  If she does something involving physical activity, such as going up and down the stairs or vacuuming, she feels nauseated.  She also experiences shortness of breath when she uses the stairs.  The sun and heat also make her feel nauseated.  She almost always feels fatigued, but when she does something, it becomes more severe.  She does not lift heavy things; for example, she buys milk in pints so that she does not have to lift the gallon jugs.  When she buys

**10**

dog food, which comes in twenty-pound bags, she will use a cart to take the bags to the truck. She does not lift the bags; instead, she drags them. The only other thing she lifts is the vacuum cleaner and, at the time of the hearing, she vacuumed about once every two weeks.

Plaintiff feels like she constantly has a headache. Overall, she has good days and bad days. When she has a severe headache, she lies down and takes ibuprofen or extra strength Tylenol. Plaintiff also has high blood pressure. She states that when she is active, her blood pressure goes up. Plaintiff has diarrhea; she believes that the medication she takes is helping alleviate that. At the time of the hearing, she was having normal bowel movements. Immediately after she was exposed to PCBs, Plaintiff had severe rashes all over her body. At this point, she breaks out in a rash about once a week. When she gets the rash, it will be accompanied by headache, usually by diarrhea, and sometimes by nausea, high blood pressure, and fatigue. She thinks that when she gets tired, she is more likely to get a rash with the accompanying symptoms.

Since she was exposed to PCBs, Plaintiff has experienced problems with her memory and with concentration. Plaintiff is not being treated for any mental problems. At the time of the hearing in October 2003, she had last seen Dr. Wasserberger in person in September 2002.

Dr. Chris Ann Geist, the vocational expert (hereinafter "VE"), also testified at the hearing. The ALJ asked the VE to consider an individual of Plaintiff's age, education, and past relevant work experience, who was limited to light and sedentary work that does not involve climbing or working at unprotected heights, and who cannot be exposed to respiratory irritants including extreme cold, heat, wetness, humidity, and fumes. The VE testified that those requirements would eliminate Plaintiff's past relevant work. The ALJ then asked if this individual could perform unskilled, entry-level work, and if any jobs were available in that category. The VE testified that there were jobs available, including hand pack (sedentary), inspection (sedentary), inspection (light), food preparation (light), recreation aide (light), customer service rep (sedentary), file clerk (light), order clerk (sedentary). The VE noted that all

of the sedentary jobs have a sit/stand option.  She also noted that restroom facilities would be available, but the question would be how often a person needed to leave the work station. (R. 346-49.)

The VE testified that employers will usually tolerate a maximum absentee rate of two to three days a month because the jobs available to the hypothetical individual are entry level and highly competitive; furthermore, four absences or more per month would preclude entry level jobs.  (R. 350.)  The VE also noted that all the jobs she described are task-completion oriented; therefore, if the individual experienced frequent interference with attention and concentration, those jobs would be precluded.  (R. 351-52.)

### D.  The ALJ's Decision

To be entitled to social security disability benefits, a plaintiff must show that he is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 416(I)(A).  To determine disability, the Commissioner uses a five-step sequential evaluation.  She determines: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, that is, one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) if the claimant cannot perform the past work, whether the claimant can do other jobs that are available in the national economy.  The claimant bears the burden of production and persuasion at Steps One through Four.  Once the claimant shows he is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment.  *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

The ALJ's decision followed this five-step process.  At the first step, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since March 19, 2001.  At the second step, the ALJ determined that Plaintiff has a combination of impairments considered "severe" within the meaning of the Social Security Act.  At the third step, the ALJ determined that Plaintiff's condition did not meet or medically equal any of the impairments listed in the regulations.  At step four, the ALJ determined that Plaintiff was not able to perform her past relevant work.  At step five, the ALJ determined that Plaintiff had the residual functional capacity to perform unskilled light and sedentary work as defined in the regulations, with no climbing or work at unprotected heights and no concentrated exposure to respiratory irritants including extreme cold, heat, wetness, humidity, or fumes.  Based on this RFC, Plaintiff is able to perform a significant number of jobs available in the national economy despite her impairments.  Finally, the ALJ stated that Plaintiff's statements regarding the degree of her symptoms and limitations are not credible "to the extent they are contrary to the determined residual functional capacity."  (R. 30.)  As a result, the ALJ found that Plaintiff was not eligible for social security benefits.

## II.  Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  The findings of the Commissioner of Social Security as to any fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, the question before the Court is not whether Plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether Plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits.  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

**13**

If the Court finds that substantial evidence does not support the ALJ's decision, the Court may reverse the decision and remand for further administrative proceedings (42 U.S.C. § 405(g)), or reverse the decision and immediately award benefits if there are no unresolved factual issues and "the record can yield but one supportable conclusion." *Campbell*, 988 F.2d at 744.

The Court gives considerable deference to the ALJ's credibility findings and will not overturn them unless the plaintiff can show that those findings are patently wrong. *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992). However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

### III. Analysis

Plaintiff argues that substantial evidence does not support the ALJ's decision for the following reasons: (1) the ALJ erred when addressing Plaintiff's mental impairments; (2) the ALJ erred at Step Five; (3) the ALJ improperly discredited Plaintiff's credibility; (4) the ALJ erred by failing to give proper weight to the opinions of Plaintiff's treating physicians; and (5) the ALJ erred when determining Plaintiff's RFC.

### A. Plaintiff's Mental Impairments

Plaintiff argues that the ALJ erred by determining that she has only slight limitations as a result of her mental condition, and by resolving those limitations with an arbitrary assignment to unskilled work. In addition, Plaintiff contends that the ALJ erred at Step Five. Specifically, Plaintiff contends that the ALJ failed to properly formulate an MRFC and failed to provide the VE with adequate information regarding Plaintiff's mental limitations; therefore, the hypothetical questions were incomplete.

14

The ALJ acknowledged that Plaintiff has some mental impairments, stating as follows:

> Intellectual testing revealed that the claimant has an average range of intellectual ability with a full scale IQ of 96, verbal IQ of 90 and a performance IQ of 100. Assessment of attention and concentration function documented variable performance within the borderline to low average range. Auditory verbal learning and memory tests revealed significant impairment with short term delay recall in the borderline range. An assessment for symptom validity and motivation was performed and the claimant was not thought to be malingering. Significant levels of depression and anxiety were also noted. The claimant was diagnosed with a cognitive disorder of moderate severity and adjustment disorder with depressed and anxious mood (citation omitted).

(R. 25.) Nevertheless, the ALJ stated that she did not consider these limitations "severe in that they do not prevent the claimant from performing the mental aspects of work beyond a limitation to unskilled work." (R. 27.) She explained her reasoning as follows:

> In assessing the severity of the claimant's mental impairments and resulting function limitations, the Administrative Law Judge has considered the claimant's functioning in four specific areas: activities of daily living, social functioning, concentration, persistence or pace and episodes of decompensation . . . . The claimant has not demonstrated through credible evidence that she has more than mild or slight limitations in activities of daily living. As noted above she participates in a variety of activities, and any limitations are due to alleged physical impairment. The claimant has not demonstrated more than mild or slight difficulties in maintaining social functioning, no social problems have been reported in her relations with friends, family or medical providers. The consulting mental exams demonstrate some difficulties in memory/maintaining concentration. Her ability to drive in unfamiliar areas (she rented a car when she traveled to California), spend significant amounts of time on her computer (several hours per day), read length [(*sic*)] articles on medical issues, live by herself, participate in hobbies such as photography, demonstrates [(*sic*)] that she has the memory and ability to concentrate in order to perform the mental aspects of unskilled work.

(R. 27.)

Unskilled work is work that "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). In light of this definition and the ALJ's acknowledgment that Plaintiff has "borderline to low average" performance in attention and concentration functions, "significant impairment" in verbal learning and memory

**15**

tests, "borderline" short term delay recall, and "significant levels" of depression and anxiety, the Court agrees with Plaintiff that a restriction to unskilled work does not adequately address how Plaintiff's mental impairments will affect her ability to perform substantial gainful activity.

The VE's testimony is consistent with this conclusion:  The ALJ attempted to account for Plaintiff's mental impairments by limiting the hypothetical individual to unskilled work in her questions to the VE.  However, the VE testified that every position she had mentioned was "task oriented," and an individual who experienced frequent interference with attention and concentration would be unable to perform the job.  (R. 351-52.)  Thus, the limitation to unskilled work, by itself, does not necessarily account for problems with concentration.  As a result, the ALJ's hypothetical questions failed to include all of Plaintiff's limitations supported by the record.

As Plaintiff noted in her memorandum, a claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job.  *See* SSR 85-15.  SSR 85-15 states, in part, as follows:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15 also emphasizes the importance of performing an individualized evaluation, stating that "[d]etermining whether these individuals will be able to adapt to the demands or "stress" of the workplace is often extremely difficult.  This section is not intended to set out any presumptive limitations for disorders, but to emphasize the importance of thoroughness in evaluation on an individualized basis."  SSR 85-15.

It is well settled that, to the extent the ALJ relies on testimony from a VE, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers. *Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004) ("When the hypothetical question is fundamentally flawed because it . . . does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand."); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) (rejecting the RFC assessment where the ALJ failed to include specific mental limitations, such as the claimant's lapses in concentration).

The Court concludes that the ALJ erred when she addressed Plaintiff's mental impairments by restricting her to unskilled work and failed to incorporate Plaintiff's mental limitations in the hypotheticals she gave to the VE or to fully explore with the VE how Plaintiff's mental impairments would affect Plaintiff's ability to perform unskilled work. Accordingly, the Court recommends remanding for reconsideration of Plaintiff's mental impairments. *See Young*, 362 F.3d at 1005. This issue alone is sufficient for the Court to recommend remand. Nevertheless, we will address Plaintiff's other arguments because they are likely to be relevant in subsequent proceedings before the SSA.

### B. The ALJ's Step Five Analysis

In addition to errors related to Plaintiff's mental impairments, addressed in the previous section, Plaintiff argues that the ALJ's Step Five analysis was inadequate because she failed to articulate sit/stand limits in the hypothetical questions and because the VE listed several jobs or job categories that conflicted with the ALJ's suggested RFC.

Plaintiff first argues that the ALJ failed to articulate limits on Plaintiff's ability to sit and stand. *See Castrejon v. Apfel*, 131 F. Supp. 2d 1053, 1057-58 (E.D. Wis. 2001); SSR 96-8p ("The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."). However, the ALJ expressly stated in her decision that the evidence did not support a sit/stand option. (R. 29.) An ALJ need not articulate frequency of an individual's need

to sit or stand where the sit/stand option is not part of the RFC.  Accordingly, the ALJ did not err by failing to articulate time limits regarding the sit-stand option in her questions to the VE.

Plaintiff next argues that some of the job categories the VE listed conflict with the ALJ's RFC because they include medium as well as light jobs, and skilled as well as unskilled jobs.  As Defendant noted, the job categories did include light and unskilled jobs and the VE did not testify that Plaintiff could perform all of the jobs in each of the categories she identified.  Instead, she apparently adjusted the number of jobs based on the ALJ's conditions.  Accordingly, the Court concludes that the purported conflict does not indicate an error in the ALJ's Step Five analysis.

### C.  Plaintiff's Credibility

Plaintiff next argues that the ALJ erred by discounting her credibility.  The ALJ stated that Plaintiff's complaints of pain and functional limitations were "not . . . credible to the extent they were inconsistent with the residual functional capacity" determined by the ALJ because Plaintiff's claimed impairments were not consistent with objective medical evidence or her reported daily activities.  (R. 26.)

Regarding Plaintiff's credibility, the ALJ stated as follows:

In assessing the claimant's residual functional capacity, the undersigned has considered the claimant's complaints of pain and functional limitations, but do not find them credible to the extent they are inconsistent with the residual function capacity as described above.  The undersigned notes that the claimant has a history of exposure to polychlorinated biphenyl (PCB), which has caused medical conditions which in turn have caused symptoms such as pain from rashes, shortness of breath, and other transitory symptoms such as headaches.  However, the degree of pain and limitation alleged by the claimant, is not consistent with the objective medical evidence regarding these impairments (for example minimal respiratory findings and the ability to smoke are not consistent with disabling respiratory symptoms), or her functional ability including her reported daily activities.

The claimant testified to extensive daily activities.  She said that she gets on her computer and reads a lot.  She spends about two to four hours per day on

emails or the Internet.  She also works with software such as "Word-XP" and takes pictures and videos with a camera and a Sony camcorder.  She last traveled out-of-town to California by airplane.  She drove with a friend to Chicago in September 2002; she said she drove with another friend in the claimant's car and split the driving.  She has two dogs and has a fenced yard, but she occasionally walks them and takes them for a swim.  She reads the newspaper, waters her plants and fixes her own meals.  She visits with her family regularly.  She occasionally attends a union meeting.  She watches television regularly and reads regularly on her medical condition and the Inquirer.  She lives alone and does her own laundry, dishes, makes her bed, vacuums, sweeps, and grocery shops.  She said sometimes her mother helps her.  She said someone else mows her yard, but she planted tomatoes and peppers.  She has a car and truck and drives one or two time a week to the grocery store or to get prescriptions or to visit family.  She states that she smokes one or two cigarettes per day.  These activities are not inconsistent with the performance of the restricted range of light and sedentary work as noted above, and are similar to work functions.  For example, during an eight hour period she sits, stands, walks, drives, lifts light items, reads, uses the computer and goes out in public.

(R. 26-27 (*sic*).)

The ALJ's description overstates Plaintiff's daily activities.  For example, the last time Plaintiff traveled out of town was about a year before the hearing and her purpose of the trip was to see her doctor.  In addition, the ALJ mischaracterized Plaintiff's testimony.  For example, the ALJ stated that "minimal respiratory findings and the ability to smoke are not consistent with disabling respiratory symptoms."  (R. 26.)  However, Plaintiff complains of shortness of breath, not "disabling respiratory symptoms."

In addition, Plaintiff contends that the ALJ failed to take into account that she performs these activities at her own pace, curtailing them as needed based on her subjective symptoms regarding concentration, pain, and other limitations.  The Court agrees.  As the Seventh Circuit court has noted, there is a substantial difference between being able to engage in sporadic physical activities and being able to work eight hours a day, five consecutive days of the week.  *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004).  Here, the fact that Plaintiff "sits, stands, walks, drives, lifts light items, reads, uses the computer and goes out in public" at her own

pace throughout the day is not inconsistent with her testimony that fatigue, lack of concentration, and other symptoms limit her ability to work.

In general, the Court will defer to an ALJ's credibility determination because the ALJ has the opportunity to observe Plaintiff. *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992). However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination. *Herron*, 19 F.3d at 335. Moreover, "[o]nce the claimant provides medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine*, 360 F.3d at 753 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); SSR 96-7p.

Here, although the ALJ acknowledges that the objective medical evidence shows that Plaintiff was exposed to PCBs, she discounts Plaintiff's credibility based on lack of objective evidence of her symptoms of pain and fatigue. However, the problem with assessing subjective symptoms such as fatigue or pain from rashes or headaches is that they are just that, subjective. Thus, they are not amenable to support by objective evidence. In this case, the objective medical evidence shows that Plaintiff had an underlying impairment. Furthermore, Plaintiff's activities of daily living are fairly restricted and not inconsistent with her testimony that her pain, fatigue, and lack of concentration limit her ability to work. *See Clifford v. Apfel*, 227 F.3d 871, 872 (noting that "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"). Therefore, the Court finds the ALJ erred in her credibility determination**.**

### D.  Opinions of Treating Physicians

Plaintiff also contends that the ALJ failed to give adequate weight to the opinions of her treating physicians.

**20**

A treating physician's opinion should usually be given more weight than the opinion of a nontreating physician because the treating physician has a longitudinal perspective on the claimant's health.  20 C.F.R. § 404.1527(d)(2).  To merit controlling weight, the treating doctor's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [not be inconsistent] with the other substantial evidence."  *Id.*

Regarding Dr. Savvas's opinion, Plaintiff states that the ALJ misstated Dr. Savvas's findings when she said that he found she could return to work.  Plaintiff relies on Dr. Savvas's report dated April 20, 2001, in which Dr. Savvas stated that Plaintiff could return to work part time for two weeks with limitations on walking, standing, lifting, and prolonged sitting, and no exposure to PCBs.  The same report indicated that Plaintiff could return to full time work after two weeks of part-time work.  Documents dated May 4, 2001, and May 17, 2001, confirm that Dr. Savvas released Plaintiff to full time work (with no PCB exposure) "in full capacity." (R. 239-40.)  Thus, the limitations suggested by Dr. Savvas on April 20, 2001, applied to the two weeks of part-time work.  No subsequent records from Dr. Savvas that the Court could read provide additional information regarding Plaintiff's RFC or ability to return to work.  Thus, the ALJ did not err in her consideration of Dr. Savvas's opinions.

Regarding Dr. Wasserberger, Plaintiff first states that the ALJ attacked his overall credibility by stating that he "titles himself 'medical toxicologist'" and by stating that Plaintiff had gone to Dr. Wassenberger "to support the claimant's legal actions, rather than simply for treatment."  (R. 23.)  She contends that this indicates the ALJ's predisposition to deny the claim and that the ALJ should not have considered Plaintiff's motives for consulting Dr. Wasserberger.

Defendant responds that the ALJ may question a doctor's credibility.  See *Saelee v. Chater*, 94 F.3d 520, 522-23 (9th Cir. 1996) (stating that the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them, but permitting an ALJ to question a doctor's credibility where the doctor's opinion letter had been solicited by the claimant's counsel).  The Court will not speculate on a matter that has no direct bearing on its

**21**

analysis.  The Court does note that Dr. Wasserberger is a treating physician.  His participation begin after Plaintiff's exposure to PCBs in 2001, and he has continued to treat Plaintiff since that time, examining her, referring her to other doctors, and providing prescriptions to treat her symptoms.  The fact that he is located in California and that his physical, face-to-face contacts with Plaintiff are limited to about once a year does not undermine his status as a treating physician.

The ALJ stated that she did not give Dr. Wasserberger's reports controlling weight because (1) he "diagnosed several impairments based on a finding that the claimant had been exposed to PCBs without medical findings that actually establish a specific impairment; examples are respiratory and liver impairments" (R. 23); (2) "Dr. Wasserberger's conclusions that the claimant has multiple long-lasting symptoms of PCB exposure such as memory impairment, obesity, etc., are not supported by actual objective medical test results and in fact the medical testing at the time of his exam indicates normal liver and mostly normal lung functions" (R. 24); and (3) "he has not supported his statements regarding 'breathing problems, gastrointestinal dysfunction, endocrine dysfunction, and immune dysfunction' with any objective medical evidence" (R. 24).  In addition, she did not give Dr. Wasserberger's conclusions regarding Plaintiff's RFC limitations controlling weight because (4) he did not state what specific impairment was related to the specific limitations he noted; and (5) he did not make findings that would support any of his limitations, "for example, no reason is given as to what would cause pain to the extent the claimant could not walk more than one block" (R. 25).  Regarding Dr. Wasserberger's February 2004 RFC evaluation, the ALJ specifically rejected Dr. Wasserberger's opinion that Plaintiff could never lift ten pounds because she stated that Plaintiff was able to lift and carry twenty-pound bags of dog food.  She rejected his opinion that Plaintiff could not climb because Plaintiff testified that she climbs ten stairs every day to get to her bedroom on the second floor.  She rejected his opinion that Plaintiff should not bend based on the testimony that Plaintiff gardens, drives, has traveled in an airplane, makes her bed, and loads the dishwasher.  As a result, she rejected the findings in the February 2004 RFC evaluation based

**22**

on "inconsistencies between Dr. Wasserberger's assessment and the actual medical testing and the claimant's actual ability to perform various tasks such those cited above."  (R. 26.)

Plaintiff takes exception to the ALJ's statement that Dr. Wasserberger's opinions are not supported by objective medical evidence.  She refers to the evidence the Plaintiff was exposed to PCBs and that a fat biopsy recorded the presence of PCBs in Plaintiff's body at a rate of 87.7 parts per billion.  (R. 229.)  Dr. Wasserberger relied on this evidence of exposure and deduced that it caused Plaintiff's symptoms of hives, rhinitis, headaches, memory dysfunction, exacerbation of reactive airway disease, decreased energy and concentration, chronic fatigue, chronic colitis, diarrhea, and exogenous obesity.  Dr. D'Elia's test results also constitute evidence supporting Dr. Wasserberger's opinions regarding Plaintiff's cognitive disorders, depression, and anxiety.  Finally, Plaintiff contends that the ALJ erred when she disregarded Dr. Wasserberger's opinion that Plaintiff was immunocompromised based on the fact that Plaintiff had normal liver function.

The Court agrees with Plaintiff that the fact that Plaintiff's liver function was normal and her respiratory function was mostly normal does not warrant a conclusion that Plaintiff has *none* of the alleged "multiple long-lasting symptoms of PCB exposure."  (R. 24.)  Furthermore, the Court disagrees with the ALJ's statement that Dr. Wasserberger's opinions are not supported by objective medical evidence.  The record contains medical evidence of Plaintiff's exposure to PCBs.  Dr. Wasserberger is a certified medical toxicologist, that is, an expert in the study of poisons and their effects, and he opined that this exposure caused Plaintiff's other symptoms.  No treating or consulting physician has disagreed with his conclusion.  In fact, Dr. Moisan opined that Plaintiff's continuing symptoms indicated "an ongoing antigenic stimulation" (R. 145), and Dr. Patel opined that Plaintiff has polysystemic problems as a result of her exposure to PCBs (R. 181).

To the extent that the ALJ discredits Dr. Wasserberger's testimony regarding Plaintiff's subjective symptoms because they are not supported by objective medical evidence, the Court

concludes that the ALJ erred.  As noted above, the problem with subjective symptoms is that they cannot be supported by objective medical evidence other than evidence of the underlying impairment; in this case, exposure to PCBs.  Regarding memory impairment specifically, the Court notes that the reports from Dr. Cadwell, Dr. D'Elia, and Dr. Durand all opined that Plaintiff had experienced this symptom.  A treating physician's opinion concerning the nature and severity of a claimant's impairments will be given controlling weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(d)(2).

The ALJ also rejected Dr. Wasserberger's RFC evaluation because it was inconsistent with Plaintiff's testimony.  The Court has already concluded that the ALJ overstated Plaintiff's activities of daily living.  Plaintiff did not testify that she was able to lift and carry twenty pound bags of dog food; she testified that she drags them or uses a cart to move the bags to her truck. (R. 331.)  She also testified that she buys milk in pints because she can hardly lift a gallon jug. (R. 330.)  Similarly, the fact that Plaintiff can climb the stairs to get to her room does not necessarily indicate that Plaintiff has no difficulty with climbing.  In fact, Plaintiff testified that she experiences nausea and shortness of breath when she uses the stairs.  (R. 329.)

Accordingly, to the extent explained above, the Court concludes that the ALJ erred when she rejected Dr. Wasserberger's opinions.

### E.  Residual Functional Capacity

Plaintiff next argues that the ALJ erred when she determined that Plaintiff had the RFC to perform unskilled light and sedentary work, with no climbing or work at unprotected heights, and no concentrated exposure to respiratory irritants including extreme cold, heat, wetness, humidity, or fumes.  Specifically, Plaintiff contends that the ALJ erred by (1) failing to give adequate weight to the opinions of Dr. Wasserberger and Dr. Savvas and inappropriately dismissing evidence that supported more severe limitations; (2) failing to explain what evidence she relied on; (3) failing to evaluate how Plaintiff's combination of impairments affected her ability to

work; and (4) failing to take into account Plaintiff's MRFC and, in fact, to properly determine Plaintiff's MRFC.

Residual functional capacity is the most a claimant can still do despite her physical and mental limitations.  20 C.F.R. § 404.1545(a).  The ALJ considers the claimant's ability to lift weight, sit, stand, walk, push, pull, etc., to determine RFC.  20 C.F.R. § 404.1545(b).  The ALJ then uses the claimant's RFC to determine her ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy).  *Clifford v. Apfel,* 227 F.3d 863, 873 n.7 (7th Cir. 2000).  The regulations define sedentary, light, and medium work as follows:

> (a) Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) Medium work.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(a-c).

The record regarding Plaintiff's physical RFC includes Dr. Graham's RFC evaluation, dated October 2001, and Dr. Wasserberger's reports dated May 2003, June 2003, and February 2004.  Dr. Graham's evaluation indicates that Plaintiff has no postural limitations (which include

stooping, bending, kneeling, and crouching[2]), can occasionally lift fifty pounds, and can frequently lift twenty-five pounds.  In contrast, Dr. Wasserberger reported that Plaintiff is severely limited in her ability to lift (up to ten pounds occasionally, at best) and bend (due to diarrhea); he also lists a number of other restrictions that affect Plaintiff's ability to work (including mental limitations which the Court addressed in an earlier section).

>Regarding Plaintiff's RFC, the ALJ stated as follows:

>The claimant has not demonstrated with credible evidence that she lacks the physical and mental residual functional capacity to perform unskilled (due to all mental problems including problems with headaches/depression/anxiety/cognitive that result in memory and concentration deficits that limit her from performing complex/technical work) light and sedentary (due to fatigue, headaches and any musculoskeletal pains) work with no climbing or work at unprotected heights (due to shortness of breath, colitis, obesity) and no concentrated exposure to respiratory irritants including extreme cold heat, wetness, humidity or fumes (due to rashes and respiratory problems, although the undersigned notes that the claimant continues to smoke cigarettes and obviously tolerates concentrated amounts of respiratory irritants).  The claimant has mentioned problems with diarrhea which she states is now controlled with medication; this impairment would not impose additional limitations on the claimant's ability to work.  All of the claimant's alleged impairments and symptoms including all those mentioned by the claimant's representative at Exhibit 14E have been considered when determining this residual functional capacity.

(R. 26 (*sic*).)

>The Court has reviewed the ALJ's explanation of how she determined Plaintiff's RFC. Her conclusion that Plaintiff has the RFC to perform light and sedentary work implicitly rejects

---

[2]SSR 85-15 states, in part, as follows:
Stooping, kneeling, crouching, and crawling are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending.  Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work, particularly when objects below the waist are involved.  If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact.

Dr. Graham's RFC assessment.  (Moreover, the record contains *no* evidence that supports Dr. Graham's conclusions, in particular, his conclusions regarding lifting and bending.)  In addition, some of the ALJ's statements are inaccurate.  For example, she states that "claimant has mentioned problems with diarrhea which she states is [(*sic*)] now controlled with medication; this impairment would not impose additional limitations on the claimant's ability to work."  (R. 26.) No evidence supports the ALJ's statement that Plaintiff's diarrhea is now under control and would pose no limitations on Plaintiff's ability to work.  Plaintiff testified that, although the medication had helped with the diarrhea, she usually gets diarrhea when she gets a rash, and that occurs about once a week.  (R. 335-38.)  In addition, Dr. Wasserberger reported that bending exacerbated the problem and he has consistently stated that Plaintiff needs access to a bathroom as part of her work environment as a result of her chronic diarrhea.

For the reasons stated above, in addition to the discussions regarding Plaintiff's MRFC and credibility and Dr. Wasserberger's opinions, the Court concludes that the ALJ's RFC determination is not supported by substantial evidence in the record.  Therefore, the Court recommends remanding this case for further proceedings consistent with this recommendation.

### IV.  Summary

For the reasons set forth above, the Court recommends **GRANTING** Plaintiff's Motion for Summary Judgment **(#10)** and **DENYING** Defendant's Motion for an Order Which Affirms the Secretary's Decision **(#14)**.  The Court also recommends that the case be remanded to the Commissioner for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4, which would terminate the case.  *See Shalala v. Schaefer*, 509 U.S. 292, 299 (1993) (a sentence-four remand order terminates the case).

**27**

The parties are advised that any objection to this recommendation must be filed in writing with the Clerk within ten (10) working days after service of a copy of this recommendation.  *See* 28 U.S.C. 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 27th day of February, 2006.

_____ s/ DAVID G. BERNTHAL_____
U.S. MAGISTRATE JUDGE

**28**